UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID **arthur.dachamp.1** THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK, INC. | Misc. No. 19-SW-413 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Cheney Pruitt, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, further described in Section I of Attachment B, pertaining to the subscriber or customer associated with the user ID. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the information described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2. I am a Special Agent with the Federal Bureau of Investigation, and have been since September 16, 2018. Prior to joining the FBI, I served for three years as a police officer in Tullahoma, Tennessee, where I investigated crimes including missing/runaway juveniles,

domestic assaults, sexual assaults, burglaries, and drug related offenses. As a part of my duties as a Special Agent with the Federal Bureau of Investigation, I now investigate criminal violations relating to child exploitation and human sex trafficking, including violations relating to anyone who knowingly recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person, knowing that the person is underage of 18 and will be caused to engage in the sexual act, in violations of 18 U.S.C § 1591. I have received training in the area of child sex trafficking and child exploitation, and had the opportunity to observed and review numerous examples of child sex trafficking. I have also participated and assisted in multiple child sex trafficking investigation cases.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C § 1591 have been committed by unknown persons with the Facebook user name Arthur Dachamp and user ID Arthur.dachamp.1. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

5. On July 27, 2019, Memphis Field Division conducted undercover operations to recover suspected juvenile victims of sex trafficking as a part of a nationwide initiative known as Operation Independence Day. Agents identified advertisements from known escort websites that

2

contained images of suspected juveniles in an attempt to recover the juvenile and identify possible adult traffickers.

6. On July 27, 2019, at approximately 6:19 p.m., A Task-Force Officer with the Federal Bureau of Investigation sent a text message "Hello. Are you available?" using an undercover phone to (901) 616-1071. The number (901) 616-1071 was attached to an advertisement located on Megapersonals.com featuring a girl who investigators flagged as a possible juvenile. Through training and experience, I know that Megapersonals.com is an online site that facilitates procurement of "escorts" for "dates." I have also discussed Megapersonals.com with other law enforcement officers who have investigated cases involving the sexual exploitation of minors involving this site.

7. At approximately 6:20 p.m., the Task-Force Officers received a responsive text affirming the availability of the individual. The Task-Force Officer then stated they did not see the "donation" amount, and asked how much is 30 minutes. I know that it is common to refer to the price of a "date" as a "donation" when setting a date for money. At 6:21 p.m. the Task-Force Officer received a response of 80 and was instructed to go to room 223 at 5119 American Way. When the Task-Force Officer and Agents arrived at 5119 American Way, the Rodeway Inn, and knocked on the door of room 223 they located a 14 year old female, "AD" who stated she was not the girl who was supposed to conduct the date. The juvenile also stated the individual who was setting the dates was located at the pool wearing a black shirt and red shorts and his name was Arthur. Agents located the individual at the pool area matching the exact description and was later identified as Arthur Deterian Hopkins.

8. Arthur Hopkins was taken into custody and interviewed, Hopkins stated he first met "AD" when she messaged him on Facebook asking him to help her make some money.

Hopkins instructed "AD" to put her picture on one of his Facebook status updates. Hopkins was soon contacted by his friends, who Hopkins stated "like to spend money on girls", asking who "AD" was. Hopkins would instruct "AD" to reach out to the individual for a "date". Hopkins stated he would mainly communicate with "AD" through Facebook Messenger and Facebook Video chat.

9. After recovering "AD" from the Rodeway Inn, she was transported to FBI Memphis Headquarters where she was interviewed. "AD" stated she met Arthur Hopkins on Facebook when he messaged her asking her if she wanted to make money. After a short discussion on Facebook Messenger Arthur Hopkins and another adult male picked her up and transported her to a residence. While at the residence she was sexually assaulted twice and then explained that every girl who works for Arthur Hopkins has to have sex with him first. "AD" began conducting dates for Arthur Hopkins that same day. Dates were facilitated by Arthur Hopkins by using pictures taken of "AD" at the residence in lingerie and videos of her "twerking" to create and advertisement on Megapersonals.com. The photos used for the advertisement were originally taken on "AD's" phone, but were posted by Arthur Hopkins using his cell phone.

10. On August 2, 2019, Subsequent to a federal search warrant for Arthur Hopkins cell phone. A digital extraction of the cell phone revealed several messages between Hopkins and "AD" discussing dates and the exchange of money afterwards. On 07/26/2019 at 1:31 pm, "AD" text Hopkins saying, "we got 35 apiece see how much time he said on your phone". Hopkins responds to "AD", "He there…n after this I need one more play for myself fa my bday…ill get it on my phone". In another exchange between "AD" and Hopkins on 07/26/2019 at 7:02 pm, "AD" text Hopkins, "This next play I do I'ma keep it", to which Hopkins replies,

"Okok why u aint let me keep that one then" "but u can". On 07/27/2019 at 3:00 am "AD" text Hopkins and asks "is we splitting this" and Hopkins replies "Yes n he got 150". ON 07/27/2019 at 3:19, "AD" responds to Hopkins "he gave me 140" and Hopkins replies back "cool give me 80 out this play for my bday lol ten more extra dollars lol".

11.     During the time "AD" and Hopkins were communicating through text and Facebook, multiple advertisements were located online of "AD" in scantily clad lingerie, along with several partially nude photos on Megapersonals.com, a known prostitution website. These images were identified by "AD" during the interview subsequent to her being recovered at the hotel. These images were also located on the phone seized from Hopkins during his arrest.

12.     Based off of Arthur Hopkin's statement that he first met "AD" on Facebook Messenger and the admission of him using Facebook to procure potential dates, there is sufficient evidence to establish probable cause that there could be more evidence of his involvement in the sex trafficking of "AD" and other minors.

13.     Facebook was issued a preservation request for target account (Arthur.dachamp.1) on July 27, 2019, by FBI Memphis and should be preserved through December 24, 2019.

14.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

15.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook

security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account. Facebook identifies unique Facebook accounts by a user's email address, the user ID number, or the username associated with a Facebook profile.

16. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

17. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

18. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items

available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

19. Facebook allows users to upload photos and videos, which may include any metadata such as a location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

20. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

7

21. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

22. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

23. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

24. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

25. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

26. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

27. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

28. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

29. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

30. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

31. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical

problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

32.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. From my training, experience, and investigation, I know that a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to

10

locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Finally, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

33. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

34. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

## CONCLUSION

35. Based on the forgoing, I request that the Court issue the proposed search warrant. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

11

36.     Because the warrant will be served on Facebook who will then compile the requested records and information at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Matthew C. Pruitt
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on November 12, 2019

_____
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE